UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ONE HUNDRED NORWALK, LLC,         : | |
|     Plaintiff,         : | |
|              : | |
| v.         : | 3:07-cv-0012 (WWE) |
|              : | |
| TRILEGIANT CORP.,         : | |
|     Defendant.         : | |

## MEMORANDUM OF DECISION ON
## CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This action concerns a lease agreement between One Hundred Norwalk, LLC ("OHN"), and Trilegiant Corporation. Plaintiff OHN, the landlord, requests a declaratory judgment that it has not breached the lease or that Trilegiant does not have the right to terminate the lease based on a breach, and that it does not have liability for any damage to Trilegiant related to flooding of the premises at issue. OHN seeks damages for Trilegiant's breach of the covenant of good faith and fair dealing and breach of contract.

Defendant Trilegiant has filed a counterclaim seeking a declaratory judgment that the premises are untenantable, that it may terminate the lease, and that OHN has breached the lease agreement. It also seeks damages based on breach of contract and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").

The parties have submitted cross motions for partial summary judgment. For the following reasons, OHN's motion for partial summary judgment will be granted in part; and Trilegiant's motion for partial summary judgment will be denied.

1

## BACKGROUND

The parties have submitted briefs, a stipulation of facts and supporting exhibits, which reflect the following factual background.

Trilegiant is a Delaware corporation with its principal place of business and corporate headquarters at 100 Connecticut Avenue in Norwalk, Connecticut. It leases the premises of its corporate headquarters from One Hundred Norwalk, LLC, which is owned by a group of investors led by Lyda Hakimi. Hakimi and her partner, Jerome Lowell, also own Hall Investments, Ltd., which serves as the property manager for the premises.

The property at 100 Connecticut Avenue has a history of drainage and flooding problems. Purdue Pharmaceuticals owned and occupied the property as its headquarters in the 1980s. In 1997, Purdue prepared plans to address the drainage issues in connection with a proposed expansion of the existing buildings and construction of an underground parking garage. In connection with that project, engineer John Block noted that "the existing drainage network is severely overburdened even during a 2-year [rainfall] event." Purdue ultimately relocated its headquarters to Stamford without implementing its proposed expansion or improvements.

By a lease dated October 19, 2000, Purdue entered into an agreement with Trilegiant's predecessor-in-interest, Cendant Membership Services, for lease of the premises at 100 Connecticut Avenue.

In Section 11.8, the lease addresses drainage and flooding:

> Landlord represents and warrants to Tenant that water drainage on the premises is suitable and effective for Tenant's habitability and use and occupancy of the Building, and that since modifications

2

were made to the Building in or about 1990, the Building interior has been dry and has not flooded. Subject to Article 13, if Tenant incurs any out-of-pocket damages not covered by insurance as a result of poor drainage on the Premises, Landlord will compensate Tenant therefore and shall immediately remedy the problem to the extent possible. Landlord's breach of this Section 11.8 shall give Tenant a self-help right and a corresponding right to set-off Rent.

Section 14.2 provides that "Landlord is responsible for, and agrees to hold harmless, indemnify and defend Tenant for any and all claims, costs and liabilities, related to the presence of any toxic or hazardous substances in or on the Premises or the Property, unless caused by Tenant."

Article 15.1 addresses the risks and responsibilities of the parties in the event of damage from the elements:

> In the event of the destruction of the Premises by fire, explosion, the elements or otherwise, during the Term, or such partial destruction thereof as to render the Premises untenantable or unfit for occupancy, or should the premises be so badly injured that the same cannot be repaired within one hundred thirty-five (135) days from the happening of such injury, or if such casualty occurs during the last twelve (12) months of the Lease Term (including any extension term), then and in such case the Term hereby created shall, at the option of the Landlord or Tenant, cease and become null and void from the date of such damage or destruction, and the Tenant shall immediately surrender said Premises and all the Tenant's interests therein to the Landlord, and shall pay Fixed Rent and Additional Rent only to the time of such damage or destruction, in which event the Landlord may reenter and repossess the Premises thus discharged from this Lease and may remove all parties therefrom. Should the Premises be rendered untenantable and unfit for occupancy, but yet be repairable within one hundred thirty-five (135) days from the happening of said injury, the Landlord may enter and repair the same with reasonable speed, and the Fixed Rent and Additional Rent shall not accrue while said injury or repairs are being made, but shall recommence immediately after said repairs are completed. But if the Premises shall be so slightly injured so as not to be rendered untenantable and unfit for occupancy, then the Landlord agrees to repair the

3

> same with reasonable promptness and in that case the Fixed and Additional Rent accrued and accruing shall not cease or terminate. The Tenant shall immediately notify the Landlord in case of fire or other damage to the Premises.

The lease specifies that the "the building systems, including sprinkler, HVAC, life safety, plumbing, sewerage, electrical systems, the roof or exterior surfaces of the walls of the Premises, or any improvements or areas outside of such walls . . . are reserved for and shall be Landlord's obligations hereunder except as otherwise expressly provided herein."

Relevant to structural repairs and replacements, Section 11.3 provides that the landlord is "responsible for any and all structural repairs and replacements (including without limitation the roof, exterior walls, load bearing interior walls, foundation, columns)." That section states further that landlord "represents that all Building Systems are in good repair and working order."

According to Section 6.1, the landlord "covenants that the Tenant may peaceably and quietly have, hold and enjoy the Premises for the Lease Term," and "represents and warrants to Tenant that the Premises may be used and occupied as an office."

Section 13.2 requires the landlord to maintain "commercial general liability" insurance to cover, inter alia, claims for property damage in an amount not less than $5,000,000 per occurrence. . . ." It also states that the landlord's insurance "shall be primary for all claims for which Landlord is responsible" and that "landlord shall name Tenant as an additional insured."

In late 2000 and early 2001, defendant made certain improvements to the interior space of the property, including installation of new carpeting. During the

4

renovation, defendant discovered what appeared to be mold in certain areas of building. In response, Purdue paid for a mold abatement contractor to remove the effected drywall and disinfected the area.

On September 21, 2001, the property incurred flooding, resulting in the displacement of forty-one of defendant's employees. Purdue hired vendors to extract the water, dry the carpet and apply an anti-microbial agent to the carpet.

On September 2 and 3, 2002, the property flooded again, displacing 104 employees. Again, Purdue paid for the required cleanup and treatment.

On September 13, 2002, defendant received notice from OSHA that the agency had received a complaint about the risk of hazards, specifically mold and mildew, at Trilegiant's headquarters.

In October 2002, Trilegiant discovered what appeared to be mold growing on interior walls and behind the trim in areas of the building affected by the September 2002 flood. Purdue paid for the work required to remediate and repair the area.

On October 27, 2003, another flood damaged the property and Purdue paid for the clean-up and remediation. Purdue also attempted to remedy the poor drainage by applying waterproofing material to a section of the building's foundation, drilling holes into the inside of the foundation, and installing a large sump pump. Unfortunately, these measures did not cure the drainage problem.

On June 23, 2004, Purdue sold the property to OHN and assigned all of its rights and responsibilities under the lease to OHN. Purdue informed OHN that the building had a history of flooding and drainage problems. In connection with the sale, Trilegiant provided an estoppel certificate acknowledging that the lease would continue to be in

full force. The estoppel certificate also stated that Trilegiant "reserves all rights with respect to Landlord's representations, warranties and obligations under the Lease including without limitation Section 11.8."

OHN negotiated a side agreement with Purdue about the drainage problem. In connection with the sale, OHN and Purdue entered into an escrow agreement pursuant to which Purdue agreed to place $100,000 into an escrow agreement and to complete certain work to address the flooding problem. Purdue also took steps to remediate the drainage problems prior to OHN's closing on the property. OHN assumed that the problem was solved when it purchased the premises.

In August 2004, the building was flooded, damaging Trilegiant's carpet. OHN paid for the clean up and remediation after the flooding.

On September 14, 2004, OHN wrote to the Connecticut Department of Transportation ("DOT") as part of its efforts to petition state and local officials to redress the drainage problems in the system abutting the premises.

On September 15, 2005, Trilegiant suffered a significant flood that affected approximately ten thousand feet of office space.[1]

OHN wrote letters to government officials describing the flood and the extent of damage in an effort to petition state and local officials to redress the existing drainage problem.

OHN sent Trilegiant a memo regarding a proposed protocol for payment of flood-related expenses and requested that invoices from vendors for services rendered in

---

[1] Prior to this flood, OHN and Trilegiant had discussed possible expansion of the premises for Trilegiant's headquarters.

connection with the September 15, 2005 flood "be paid by Trilegiant or its carrier." Trilegiant rejected OHN's request. OHN later reimbursed Trilegiant for expenses it had incurred responding to the September 15, 2005 flood. Several other floods also occurred during 2005 and 2006. OHN paid for all flooding-related expenses up until August 2006.

On March 9, 2006, Lyda Hakimi and Todd Hakimi met with DOT officials to discuss the drainage and flooding problems at the property. DOT indicated that construction related to improving the drainage would not likely commence until 2009.

On August 27 and 28, 2006, the property suffered a serious flood, with water flooding more than 50,000 square feet of office space. Trilegiant's Information Technology staff was required to assess the safety of the computer systems and to protect them from flood waters. Vendors, including an electrician, an environmental consultant and a moving company, were called in to assist with the remediation after the flood. Trilegiant also had to relocate approximately 120 employees, some for up to one week, others for three or more weeks.

On a tour of the damage on August 28, 2006, Lyda Hakimi reassured Trilegiant that OHN "would do anything and everything in our power to help." Thereafter, OHN asserted its position that Trilegiant, through its required property insurance, should pay for the expense associated with the flood damage.

In a letter to Lyda Hakimi, Trilegiant represented that OHN, in failing to resolve the flooding problems, had "breached its obligations as landlord under the Lease, and this letter constitutes notice thereof." The letter stated further that, if OHN "fails to resolve the flooding problems at the Premises within one hundred thirty-five (135) days

7

following the date of this letter, Trilegiant reserves the right to exercise any and all of its rights and remedies under the Lease, at law or in equity, including, without limitation, the termination of the Lease."

After correspondence between Trilegiant and OHN in October regarding OHN's insurance coverage, OHN applied and accepted insurance for the Premises. OHN also hired engineer Block to assist with resolving the on-going drainage and flooding problems. In mid-December 2006, Block and his firm submitted a proposal to the state for approval.

On January 12, 2007, Trilegiant submitted a claim to its insurer totaling $581,609.14. Trilegiant then sent OHN an invoice for the $250,000 deductible not covered by the insurance.[2] Trilegiant represented that OHN was obligated to pay the deductible pursuant to Section 11.8 of the Lease.

On February 27, 2007, Trilegiant notified OHN that it would offset the unreimbursed $250,000 against the rent owed to OHN.

On March 2 and April 15, 2007, the premises sustained water damage and clean-up costs from flooding. After the March flood, Trilegiant sent OHN a letter advising it that Trilegiant considered OHN in breach of the lease terms since OHN had failed to remedy the drainage problem and refused to compensate Trilegiant for its damages caused by flooding.

OHN refused to compensate Trilegiant for the $15,407 in expenses that it had incurred for cleaning up from the March 2 and April 15, 2007 incidents. However,

---

[2]Trilegiant also submitted a business interruption claim of $9,597.66 to its insurance carrier. The carrier denied Trilegiant's claim.

Trilegiant set off that amount from its rent owed in July 2007.

Between February and April 2007, after receiving approval from the state, OHN made modifications to the property's drainage system. Nevertheless, water entered the building's office space on October 11, 2007, August 2, 2008, and September 6, 2008.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24.

Lease Termination

Trilegiant maintains that OHN has materially breached several provisions of the lease agreement, and that such breaches entitle Trilegiant to terminate the lease. OHN requests this Court to enter a declaratory judgment that Trilegiant is not entitled to terminate the lease and cease paying rent based on OHN's alleged breach of lease provisions.

According to Connecticut common law, the covenants of a commercial lease are deemed to be independent so that breach of the landlord's promise to perform services does not suspend the obligation of the tenant under the lease to pay rent. Lavin v. Emery Air Freight Corp., 980 F. Supp. 93, 104 (D. Conn. 1997). However, a landlord's breach of the implied covenant of quiet enjoyment by either actual or constructive eviction provides the tenant a defense to an action for nonpayment of rent. S.H.V.C. Inc. v. Roy, 37 Conn. Supp. 579, 585 (App. Div. 1981). A tenant alleging constructive eviction must prove that the landlord's breach rendered the premises untenantable, the tenant vacated the premises, and the tenant did not vacate the premises until after giving the landlord reasonable time to correct the problem. Heritage Square, LLC v. Eoanou, 61 Conn. App. 329, 331 (2001). To establish that the premises are untenantable, a tenant must "demonstrate actual and serious deprivation of the use contemplated by the parties to the lease." A tenant cannot prevail on its claim of constructive eviction so long as it remains in possession of the premises. S.H.V.C., 37 Conn. Supp. at 586.

Trilegiant has cited no persuasive authority supporting abandonment of this precedent, and it is undisputed that Trilegiant remains in premises. Accordingly, the

10

Court finds that Trilegiant is not entitled to terminate the lease based on OHN's alleged breach of several lease provisions.

The Court will enter summary judgment on OHN's request for declaratory judgment that Trilegiant is not entitled to terminate the lease and cease paying rent based on the alleged breach of lease provisions unless Trilegiant can prove that the premises are untenantable.

### Obligations of the Parties Under the Lease

#### Payment of Clean-Up Costs

Trilegiant asserts that OHN is obliged under the lease terms to reimburse Trilegiant for all clean-up costs not covered by insurance that result from flooding incidents. OHN counters that Trilegiant has misconstrued the lease, which evinces an intent that the landlord should not bear the risk for costs incurred that fall below Trilegiant's insurance deductible. OHN maintains that summary judgment in Trilegiant's favor is precluded due to disputed issues of material fact relevant to interpretation of the lease and whether Trilegiant's deductible was reasonable.

A contract must be viewed in its entirety, and every provision must be given effect if it is possible to do so. United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670-71 (2002). In interpreting contract terms, the Court must afford the language used "its common, natural and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Wolosoff v. Wolosoff, 91 Conn. App. 374, 381 (2005). Where the language of the contract is clear and unambiguous, the contract should be given effect according to its terms. Breiter v. Breiter, 80 Conn. App. 332, 336 (2003). A contract is unambiguous when its language is clear and

conveys a definite and precise intent.  Canterbury Heights Condominium, Inc. v. Local Land Dev. LLC, 272 Conn. 724, 735 (2005).  "A contract term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument. . . ."  Heyman v. CVS, Inc., 178 Conn. 215, 227 (1979).  "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings."  Barnard v. Barnard, 214 Conn. 99, 110 (1990).

A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself.  Levine, 232 Conn. at 278-279.  The ambiguity "must emanate from the language used" by the parties.  United Illuminating Co., 259 Conn. at 671.  If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.  Lopinto v. Haines, 185 Conn. 527, 538 (1981).   The question of whether a contractual provision is ambiguous presents a question of law.  LMK Enterprises, Inc. v. Sun Oil Co., 86 Conn. App. 302, 306 (2004).  Where a contract term is found to be ambiguous, the court may properly discern the intent of the contract through consideration of extrinsic evidence.  See United Illuminating Co, 259 Conn. at 675.

Trilegiant asserts that several lease provisions impose the responsibility for flood-related expenses upon OHN.  Specifically, Trilegiant relies upon (1) Section 6.1's warrant that the premises are suitable for use as an office and covenant of quiet enjoyment and use; (2) Section 11.3's provision that OHN will be responsible and repair at its expense the Building Systems, plumbing, exterior walls, interior load bearing

walls, foundation, electrical system, and everything outside the building; (3) Section 11.8's warrant as to the suitability of the drainage system and agreement to compensate Trilegiant for expenses resulting from flooding; (4) Section 15.1's provision that OHN will promptly repair the premises if damaged by flooding; and (5) Section 14.2's agreement by OHN to be responsible for hazardous or toxic substances.

In support of its position, OHN points out that its Section 11.8 obligations to compensate Trilegiant for flood-related expenses are subject to Article 13, which requires Trilegiant to maintain "'All Risk' property damage" at "full replacement cost" for Trilegiant's property covering, <u>inter alia</u>, "business interruption and water damage of any type." Pursuant to Section 13.1, Trilegiant must (1) maintain "all risk" property insurance for the building at "full replacement cost" and (2) carry the insurance "in the Landlord's name." OHN maintains that reading Sections 11.8 and 13.1 together evinces an intent "to assure that the Landlord's interest in the Premises is adequately protected" and that the landlord should not have to bear risk of the tenant's expenses below the deductible. OHN represents that expert witnesses and several commentators consider a deductible as a form of self-insurance that is assumed by the insured.

The Court cannot discern the intent of the lease from the plain language of the lease provisions. Thus, the Court finds that disputed issues of fact preclude summary judgment as to the obligations of the parties under the lease.

Trilegiant asserts that it is entitled to a declaration that the premises are untenantable because OHN breached the express warranties of habitability and covenant of quiet enjoyment. Whether a premises is untenantable presents a question

of fact for the trier of fact. Welsch v. Groat, 95 Conn. App. 658, 663-65 (2006). Accordingly, the Court will not assess the degree of deprivation on summary judgment. Summary judgment will be denied.

CUTPA

OHN argues that summary judgment should enter on Trilegiant's CUTPA counterclaim. Specifically, OHN asserts that a CUTPA claim cannot be premised upon a breach of contract claim.

CUTPA provides, in relevant part, that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The Connecticut Supreme Court has adopted the following factors known as the "cigarette rule" to determine whether a trade practice is unfair or deceptive: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statute, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers, competitors, or other businessmen." A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215 (1990). In order to prove that the practice is unfair, it is sufficient to meet only one of the criteria or to demonstrate that the practice meets all three criteria to a lesser degree. Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 368 (1999). However, absent substantial aggravating circumstances, simple breach of contract is insufficient to establish a CUTPA violation. Lydall, Inc. v. Ruschmeyer, 282 Conn. 209, 248 (2007).

14

The instant case presents a controversy concerning the obligations of the parties to one lease agreement. Although the flooding problems appear to have been pervasive over the years, there is no inference of fact that OHN's conduct constituted an offense to public policy; was immoral, unethical, oppressive or unscrupulous; or that it caused substantial injury to consumers or competitors. Accordingly, the Court will grant summary judgment in OHN's favor on the CUTPA claim.

Attorneys' Fees

OHN requests that a hearing be scheduled to determine its attorneys' fees as the prevailing party. Section 18.9 of the lease provides that the prevailing party to a dispute relating to a breach of the lease "shall be entitled to recover from the non-prevailing party ... reasonable attorneys' fees and costs, expert witness fees and court costs as may be fixed by the court or jury." The Court will determine the attorneys' fees after resolution of all the outstanding claims.

## CONCLUSION

For the foregoing reasons, OHN's motion for partial summary judgment [#48] is GRANTED in part and denied in part; and Trilegiant's motion for partial summary judgment [#30] is DENIED. Consistent with this ruling, the Court GRANTS summary judgment in OHN's favor on the CUTPA counterclaim, and finds that Trilegiant is not entitled to terminate the lease based on the alleged breaches of the lease according to the evidence submitted on summary judgment.

Within 30 days of this ruling's filing date, counsel should contact this chambers to provide mutually agreeable dates for trial and to inform the Court whether the parties are interested in a settlement conference with a magistrate judge.

Dated at Bridgeport, Connecticut, this _22d___ day of December, 2008.

/s/
Warren W. Eginton
Senior United States District Judge